[No. 3819.    Decided January 6, 1902.]

E. BLAIR, *Respondent*, v. METROPOLITAN SAVINGS BANK, *Appellant*.

CORPORATIONS — UNAUTHORIZED ACTS OF OFFICERS — RATIFICATION.

Although a loan made by a corporation may have been beyond its charter powers and a sale of the note and mortgage obtained upon such loan, with a guaranty of payment, may have been unauthorized by the board of directors, yet the corporation will be bound thereby on the theory of ratification, where its articles of incorporation were afterwards amended so as to legalize transactions of that character and subsequent to such amendment the liability of the corporation on such guaranty was recognized by it and provision made by its board of directors to meet its liability by entering into a new agreement with its obligee.

SAME — BY-LAWS — ABROGATION BY NON-USAGE.

Where a by-law of a corporation has been disregarded by the corporate officers for a length of time sufficient to bring knowledge thereof home to the stockholders and raise a presumption of their acquiescence, such non-usage will work an abrogation of such by-law.

Appeal from Superior Court, Kittitas County.—Hon. JOHN B. DAVIDSON, Judge.    Affirmed.

*Stiles & Nash,* for appellant.

*T. W. Hammond* and *B. F. Heuston,* for respondent.

The opinion of the court was delivered by

FULLERTON, J.—The respondent, who was plaintiff below, brought this suit against the appellant to recover upon

a promissory note and to foreclose a mortgage given to secure the same, covering real property situated in Kittitas county, in this state.     The note and mortgage were executed by the appellant on March 20, 1896, were in the usual form, and were conditioned for the payment by the appellant to the respondent of $13,930 on June 1, 1897, with interest at eight per cent. per annum until maturity and twelve per cent. thereafter.     The respondent was incorporated in July, 1887, under the name of "Tacoma Building and Savings Association."     The objects of its incorporation, as expressed in its articles of incorporation as then filed, were:

"The transaction of a general savings, loan, real estate and building business, and for the transaction and doing of all matters of business cognate therewith, including the power to execute and receive mortgages or other securities for advances of money, to construct dwellings or other buildings, and to receive money or security therefor, and to do and transact such other business pertaining to the general objects of said corporation as hereinbefore specified as may be designated in or provided by the by-laws."

The by-laws adopted at the organization of the corporation contained, among others, the following provisions:

"10.  .  .  .  No transfer or assignment of any bond, mortgage, real estate or other security belonging to the association shall be made except by vote of the board of trustees, and then only by an instrument signed by the president and secretary, with the seal attached.

"16.     No person shall be entitled to a loan from this Association unless such person is the owner of at least one full paid share.

"17.     Whenever the funds in the treasury will warrant, and two or more bidders are present and bidding, one or more loans shall be made to the stockholder who will give the highest premium at auction for the same, in such manner as the trustees shall determine; provided, that as the

principal object of this association is the accumulation of savings of its stockholders for the purpose of building homes for their benefit, precedence shall be given to applicants who desire the erection of dwellings.  .  .  .

"19.    The trustees shall not make a loan of more than fifteen hundred dollars to any one person during the first year of the existence of this corporation, nor more than one loan to any one person during any one year."

The by-law last quoted was amended in January, 1888, so as to make the maximum loan $2,500, instead of $1,500. While the by-laws as amended appear to have remained without a subsequent change, the articles of incorporation were amended on April 8, 1893, by the filing of supplemental articles, by which the name of the corporation was changed to its present name, and the article relating to its objects and powers made to read as follows:

"The objects for which this corporation is formed are to transact a general banking and saving business; to buy, sell, negotiate, guarantee, hypothecate, and discount promissory notes, drafts, bills of exchange, warrants, stocks and other securities or evidences of debt; to buy, sell, negotiate, guarantee, hypothecate, issue and register bonds; to receive deposits of money or its equivalent, and to do a general safe deposit business; to buy and sell exchange coins and bullion, to loan money on real estate or personal securities; to accept and execute trusts of any description which may be committed to it by any person or by any state, county, municipal or private corporation, or by the order of any court; to act as agent or attorney-in-fact, trustee, receiver, executor, administrator, or administrator with the will annexed of any estate, or guardian of the property of any minor, or any other person under legal disability; to purchase, hold, improve, lease and sell real estate; to borrow money or securities for use in any branch of its business; to give the bonds or other obligations of the corporation as security for money or securities borrowed

by the corporation, or deposited with it or for the faithful performance of any or all trusts committed to it."

The note and mortgage in suit originated under the following circumstances: On November 29, 1889, the secretary of the appellant sent a telegram to the respondent who resided at Bucyrus, Ohio, saying, "Have gilt edge fourteen thousand loan on brick block in Ellensburg, land worth twelve thousand; owner has spent thirteen thousand cash, wants loan to finish, eight per cent., our guaranty, will you take it?" The respondent answered in the same manner, the telegram as received reading: "Will accept mortgage as offered, how much shall I stand?"; which the respondent corrects by saying that the last word was written, "send." Four days later Post telegraphed the amount required as being $13,930, which sum the respondent remitted by mail on the same day, addressing his letter to Post. On December 2, 1889, the appellant took from Samuel Kreidel and Pauline Kreidel, his wife, of Ellensburg, a note payable to itself for the sum of $13,930, and a mortgage to secure the payment of the note on the property covered by the mortgage in this action. The appellant assigned this note and mortgage to the respondent, giving him at the same time a written instrument of guaranty, executed in the name of and under the seal of the appellant, by the terms of which the appellant assumed to guarantee the payment of the note according to its tenor and effect. The makers of the note failed to pay the same at maturity, whereupon the respondent demanded payment of the appellant. The matter came before the board of trustees of the appellant on August 26, 1895, at which time the following resolution was adopted:

"Whereas, this board of directors has lately ascertained that in the year 1889, Linus E. Post and E. H. Hatfield,

while officers of the Tacoma Building and Savings Association, without the knowledge of its board of directors, and without authority of the said board, in the matter of a loan made by E. Blair, of Bucyrus, Ohio, to Samuel Kreidel of Ellensburg, Washington, procured the making of a note for $13,930, and a mortgage on real property securing the same, by said Kreidel and wife to said Tacoma Building and Savings Association; and without authority of said board assigned said note and mortgage to said Blair, and assumed and attempted, without authority of said board, to execute and deliver to said Blair a guaranty of the payment of said note by said Tacoma Building and Savings Association; and

"Whereas, said note and mortgage are now past due, and said Blair is claiming payment of the same, and demanding that this corporation make good said attempted guaranty; and

"Whereas, a defense against said claim and demand of said Blair would involve this corporation in litigation and expense; and

"Whereas, it is believed that with an extension of the time for payment of said note and mortgage, and with the management of the mortgaged property in the hands of this corporation, the mortgaged property will suffice to pay off said indebtedness and all costs and expenses; and

"Whereas, it is understood by this board, that said Blair is willing to give a reasonable extension of said note and mortgage; and

"Whereas, it is desired that there be a personal interview with said Blair with reference to the matter aforesaid;

"Now, therefore, be it resolved, That T. W. Enos, vice-president of this corporation, be and is hereby authorized to proceed to Bucyrus, Ohio, and to negotiate and arrange with said Blair an agreement concerning said note and mortgage, which shall be, in general substance, like the annexed draft; but, nevertheless, said Enos has full authority to vary said agreement from said draft, in any manner, as to its substance or form, which he may deem

advisable, and this board will ratify his action in the premises."

Pursuant to the resolution, the T. W. Enos therein named visited the respondent at Bucyrus, Ohio, and on behalf of the appellant entered into an agreement with him in which, after reciting the execution of the note and mortgage, the guaranty of payment thereof by the appellant, the fact that the mortgage was due and unpaid, the further fact that there were numerous judgments against the Kreidels and that they had conveyed the property to third persons, it was agreed that the respondent should deliver the note and mortgage to an attorney for foreclosure at the expense of the appellant; that at the sale of the premises under the decree of foreclosure the appellant would bid a sum sufficient to cover the judgment, interest and costs, or in default of such bid would forthwith pay to the respondent a sum equal to any deficiency which might arise through the sale of the property to any other bidder for a less sum; that upon becoming purchasers of the property it would pay the accrued interest, and execute to the respondent a new note and mortgage of the same tenor and effect as the former, except that it should be payable on June 1, 1897; that the appellant would, pending the foreclosure proceedings, pay interest on the principal sum at the rate of eight per centum per annum, and that in case of a redemption of the premises from the mortgage sale, the respondent would accept the principal sum and interest up to that time in full satisfaction of his debt.  This agreement was modified by a supplemental agreement executed on February 11, 1896, by the terms of which the respondent agreed to become the purchaser at the foreclosure sale and assign the certificate of sale to the appellant, this to avoid "an unnecessary production and

handling of money and expenses by way of sheriff's commissions," which would be necessary if the appellant purchased the property directly at the sale. This agreement, as modified, was carried out by the parties, and resulted, as we have said, in the execution of the note and mortgage in suit.

Immediately on the sale of the premises under the foreclosure the appellant took possession of them, made repairs thereon, procured insurance therefor, and collected the rents thereof; it also paid the interest on the note sued upon until November 1, 1897. It was shown that the respondent was a stockholder in the appellant corporation at the time of the assignment of the original note and mortgage to him, that he had sent the appellant other moneys for investment, and had purchased other mortgages which were not guaranteed. It was also shown that the appellant, at about the time of the sale of this mortgage to the appellant, had sold certain mortgages to other parties, guaranteeing the payment of the principal and interest. Kreidel was not a stockholder in the appellant corporation. It stands admitted, however, that the entire transaction was in good faith, and that none of the persons engaged therein were guilty of actual or intentional fraud.

The learned counsel for appellant maintain that the appellant did not, and could not under its charter and by-laws, loan to the Kreidels any money; that the loan made was arranged for and made to the Kreidels by the respondent himself, Post acting merely as a voluntary agent between the two; that the device of taking a note and mortgage to appellant, and of then assigning it to respondent with a guaranty of payment, was wholly unauthorized by the appellant, and was beyond its powers, had it attempted so to do; that no consideration moved to it whatever; that

the subsequent agreement by which it assumed directly the payment of the debt amounted to nothing, because it was equally without consideration, and merely a device to perpetuate the original guaranty; and, finally, that the respondent, because of his position as a stockholder in the corporation, was bound to know that its by-laws expressly forbade the transaction had with him, and he cannot, therefore, claim any rights as an innocent purchaser of the note and mortgage from the appellant. Counsel, however, concede that if the appellant had on hand a mortgage which was its own property, and sold it to the respondent, the subsequent action taken by its board of trustees would have amounted to a sufficient ratification of the act of selling to render it liable upon the note and mortgage sued upon. The trial court found the main question of fact against the appellant's contention. It found that the transaction between the parties was such as upon its face it purported to be, namely, a loan by the appellant to the Kreidels, and a subsequent sale of the note and mortgage taken to evidence and secure the same to the respondent. It seems to us that this is more in accord with the evidence than is the view maintained by the appellant. This was not the only transaction of its kind in which the appellant engaged. From its organization it made it a part of its business to make loans and afterwards sell them. The Kreidel mortgage was the eighteenth on its list of similar transactions, and the whole number reached one hundred forty-two. Certain of these, as we have said, it guaranteed. The note and mortgage, it is true, had not been executed at the time the appellant's secretary inquired of the respondent whether or not he would take the loan; but it is evident that the transaction had been in negotiation before that time, and

was, as between the appellant and the mortgagors, practically closed. The mortgage was executed within two days after the respondent agreed to take the mortgage, and was made between parties who lived many miles apart, and bears date one day prior to the day the appellant telegraphed the respondent the amount required to take up the loan. The appellant, also, advanced to the borrowers $5,000 on the loan prior to the time it received any money from the respondent. These facts, taken in connection with the fact that the mortgage was taken in the name of the appellant, the fact that it was engaged in this character of business, and the fact that it proffered to guarantee the payment of the note and mortgage as an inducement to its purchase by the respondent, seem clearly to point to the conclusion that the appellant understood that it was making the loan, and that such in fact was the real transaction. As against this conclusion one of the chief arguments of counsel is that the transaction appears to have been a voluntary one on the part of the appellant. We do not so read the evidence. While it is true that the appellant's witness, testifying from the account books of the appellant, pointed to certain entries in them from which he apparently sought to convey the impression that the appellant had remitted to the mortgagors sums equal to the face amount of the mortgage, yet these entries with others in the books, when taken in connection with the witness's explanations, show very clearly the contrary. As we have said, the face of the mortgage was $13,930 and was executed on December 2, 1889. On December 6, the appellant remitted to the mortgagors $5,000, charging the mortgage account with $5,035, and applying the difference to its expense account. Subsequently, on December 26th, it remitted to the mortgagors $8,000, charging the mortgage account with $8,895, and applying the

difference, $895, to its interest account. There is nothing to show that this latter sum was afterwards paid over to the mortgagors, and we think it not only represents the appellant's profit in the transaction, but tends to explain why it was engaged in this character of business in contravention of the rules prescribed by its by-laws. It is doubtless true that the appellant, when it took the loan, had no intention of carrying it itself; but it seems equally true that the loan would have been made; had the respondent's answer to its telegram been contrary to what it actually was, and that the bank would have carried the loan until it could have disposed of it to some one of its other customers.

This view of the evidence renders it unnecessary to discuss the legal questions suggested by counsel arising from the other view. It was clearly within the corporate powers of the appellant to make a contract of this character after the amendment of its articles of incorporation, even if it was not so before. By taking to itself the property, assuming the payment of the debt, and giving its own obligation therefor, it bound itself to pay the debt, and cannot now be heard in a court of equity to plead its former incapacity as a defense to a suit upon that obligation. Nor is the appellant aided by the prohibitory provisions of its by-laws. If these were not superseded by the amendment to the corporate articles, they certainly were by the acts of the corporate officers acquiesced in by the stockholders. From the first the corporate officers appear to have proceeded in utter disregard of these provisions, and non-usage of a by-law by the corporate officers, continued for a sufficient length of time to bring it home to the stockholders, will work its abrogation.

The judgment is affirmed.

REAVIS, C. J., and DUNBAR, MOUNT and ANDERS, JJ., concur.