### In re COMSCAPE TELECOMMUNICATIONS, INC., et al., Debtors.

### No. 09–51045.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Feb. 11, 2010.

Harry W. Greenfield, Jeffrey C. Toole, Jonathon M. Yarger, Cleveland, OH, for Debtors.

### *FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM OPINION AND ORDER ON MOTION TO DISMISS*

C. KATHRYN PRESTON, Bankruptcy Judge.

The matter before the Court is the latest battle in a war between shareholders

over the control of ComScape Holding, Inc. ("Holding") and its direct and indirect subsidiaries (collectively, the "Subsidiaries"). Holding is not a Chapter 11 debtor, but eight of the Subsidiaries are debtors and debtors in possession (collectively, the "Debtors") in these Chapter 11 cases, as follows:

ComScape Telecommunications, Inc., an Ohio corporation ("Telecommunications");

ComScape Communications, Inc., a Delaware corporation ("Communications");

ComScape Telecommunications of Raleigh–Durham, Inc., a North Carolina corporation, ("Raleigh–Durham");

ComScape Telecommunications of Wilmington, Inc., a North Carolina corporation ("Wilmington");

ComScape Telecommunications of Jacksonville License, Inc., a North Carolina corporation ("Jacksonville License");

ComScape Telecommunications of New Bern License, Inc., a North Carolina corporation ("New Bern License");

ComScape Telecommunications of Raleigh–Durham License, Inc., a North Carolina corporation ("Raleigh–Durham License"); and

ComScape Telecommunications of Wilmington License, Inc., a North Carolina corporation ("Wilmington License").

Attached as Exhibit A to this Order is the Organizational Chart of Holding and the Subsidiaries, reflecting the relationship of the Debtors and related non-debtor entities.

On February 6, 2009 ("Petition Date"), the Debtors filed Petitions for Relief under Chapter 11 of the Bankruptcy Code. On February 13, 2009, the Court entered an order (Doc. 29) granting the Debtors' motion for joint administration. On March 18, 2009, Holding and Bhogilal M. Modi ("Modi") filed a Motion to Dismiss these Chapter 11 cases (Doc. 80) ("Motion"), alleging that the Debtors lacked corporate authority for the filing of their Petitions for Relief. The Debtors assert that Ghanshyam C. Patel, commonly known as Ghany ("Ghany"), is the sole director of each of the Debtors and in that capacity authorized the filing of the Petitions.

■ The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of Reference entered in this District. The Court has subject-matter jurisdiction over a bankruptcy case even when a part in interest alleges that the petition was unauthorized. *See In re Brandon Farmer's Mkt., Inc.*, 34 B.R. 148, 149 (Bankr.M.D.Fla.1983) ("[T]he argument ... that this Court lacks jurisdiction over a Chapter 11 case is obviously without merit. This, of course, does not mean that the Movants do not have the right to challenge the propriety of the Petition.").

A motion to dismiss a bankruptcy case constitutes a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O). *See also Martensen v. United States Tr.*, 1992 WL 67297 at *1 (D.Neb. Apr.1, 1992) ("Dismissal of a bankruptcy case is a proceeding that by its very nature can only arise in bankruptcy; therefore, it is a core proceeding."); *In re Wahlie*, 417 B.R. 8, 11 (Bankr.N.D.Ohio 2009) ("Determinations concerning the dismissal of a case, which affects both the ability of a debtor to receive a discharge and directly affects the creditor-debtor relationship, are core proceedings....").

## I. Arguments of the Parties

Quite simply, Holding and Modi (the "Movants") seek to dismiss the chapter 11 cases on the basis that Modi is the sole director of each of the Debtors and did not give the entities or their officers authority to commence or prosecute the bankruptcy cases. The Movants also request that the

Court sanction Ghany by ordering him to pay the Movants' reasonable attorneys' fees and expenses. The Debtors, led by Ghany, insist that Ghany is the sole director and in that capacity authorized the Debtors to commence these bankruptcy cases. The parties have stipulated that Ghany was the sole director of each of the Debtors until August 7, 2006. The Movants, however, contend that a majority of the Board of Directors of Holding validly voted to remove Ghany as the sole director of the Debtors and replace him with Modi on August 7, 2006. To the contrary, the Debtors argue that the purported removal of Ghany and election of Modi were invalid for two reasons. First, the Debtors contend that the directors who took these actions were themselves not validly elected because they were elected by the other directors of Holding, not by Holding's shareholders. Second, the Debtors contend that the sole director of each of the Debtors can be removed and elected only by a vote of each Debtor's sole shareholder and that the action by the Board of Directors of Holding did not effectuate an action of the sole shareholder of each of the Debtors. Therefore, the Debtors contend, Ghany remained their sole director, and the Debtors' bankruptcy filings were duly authorized.

## II. Findings of Fact

Resolution of this dispute requires a rather lengthy tale of the history of the companies as well as a description of the pertinent provisions of their governing documents. Toward that end, based on the stipulations of the parties (Doc. 160) ("Stipulations"), the exhibits admitted into evidence and the testimony adduced at the evidentiary hearing, the Court finds and concludes as follows:

### A. Formation of Holding and the Debtors

Holding is a corporation duly formed in 1995 and existing under the laws of the State of Ohio.[1] Holding's founding shareholders were Modi, Ghany, Raman C. Patel ("Raman"),[2] Jeremiah P. Byrne ("Byrne") and Jay K. Jayanthan ("Jayanthan") (collectively, the "Founding Shareholders"). On or about November 17, 1995, pursuant to Ohio Revised Code § 1701.591, Holding, the Founding Shareholders and other shareholders entered into a Close Corporation and Shareholders Agreement ("CCSA"), governing certain aspects of corporate affairs. In due course, the Amended and Restated Articles of Incorporation ("Articles") and the Code of Regulations ("Regulations") were created and adopted by and for Holding. Additionally, Holding and Ghany entered into an Employment Agreement effective June 1, 1996 by which Holding agreed to (a) employ Ghany as Chief Executive Officer until 2012, and (b) use its best efforts to have Ghany elected Chairman of the Board of Directors.

Over the course of the succeeding few years, the Debtors were founded. The Debtors' business is provision of low cost wireless communications services to the general public. The Debtors have licensed markets in North Carolina and Ohio. Holding holds all of the outstanding stock of four entities, two of which are Debtors: Communications, Telecommunications, ComScape Intellectual Properties, Inc. (not a Debtor) and ComScape International, Inc. (also not a Debtor). (Communica-

---

1. Holding was initially incorporated under the name "PCS Mobile America, Inc." In or around May 1996, the corporation name was changed to "ComScape Holding, Inc."

2. Raman Patel is not related to Ghany.

tions and Telecommunications will be collectively referred to as the "Tier One Debtors"). Telecommunications holds all of the outstanding stock of four entities, two of which are Debtors: Raleigh–Durham, Wilmington, ComScape Telecommunications of Jacksonville, Inc. (not a Debtor), and ComScape Telecommunications of New Bern, Inc. (also not a Debtor). (Raleigh–Durham and Wilmington will be referred to collectively as the "Tier Two Debtors"). Each of the entities owned by Telecommunications holds all of the outstanding stock of a subsidiary: Raleigh–Durham License, Wilmington License, Jacksonville License and New Bern License, respectively, all of which are debtors in this case (collectively, the "Tier Three Debtors").

From the inception of Holding until August 7, 2006, Ghany was the Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors of Holding. In addition, from the inception of each of the Debtors until August 7, 2006, Ghany was the CEO and Sole Director of each of the Debtors. As discussed more fully below, although the bylaws or regulations of each of the Subsidiaries provide that their directors are to be elected at shareholder meetings or by unanimous written consent of the shareholders, Ghany in fact was elected as a director of each of the Debtors at all three tiers by the Board of Directors of Holding at meetings of that Board at which Ghany was present and voted. Ghany has never served as Secretary of any of the entities; that task fell to Jeremiah Byrne from inception of each entity until June 2003 and then to Modi. The Debtors put into evidence multiple documents denominated "Action By Written Consent of the Sole Shareholder of . . ." (collectively, the "Written Consents"). The Debtors contend that each of the Written Consents constituted an action of the sole corporate shareholder of each of the Subsidiaries,

acting through Ghany as President, to elect Ghany as the sole director of the Subsidiaries. The Court is not convinced of the authenticity or validity of the Written Consents because first, during the hearing, Modi disclaimed knowledge of the existence of any of the Written Consents and Byrne testified that the only one of the Written Consents he had seen before the hearing was the Action by Written Consent of the Sole Shareholder of ComScape Telecommunications, Inc. dated May 16, 1996, by which Holding elected Ghany, Raman, Byrne, Jayanthan and Modi as the directors of Telecommunications. Additionally, Ghany asserts that he prepared the Written Consents rather than have the corporate secretary—Byrne and later Modi—do so, even though Ghany purports to be a stickler for corporate formalities such as the discharge of duties by the proper corporate officer.

In any case, the Written Consents are not inconsistent with the unrefuted testimony that Ghany was elected as the sole director of the Subsidiaries by the Board of Directors of Holding. Indeed, Ghany testified that the directors of the Subsidiaries were elected "by written consent at an annual meeting." Because the only meetings that took place were at the Holding level, Ghany's testimony is consistent with the testimony of Jayanthan and Byrne that Ghany was elected as a director of the Subsidiaries at a meeting of the Board of Holding. In addition, certain of the Written Consents could not accomplish what they purport to accomplish because they were not actions of the necessary entity. For example, the "Action by Written Consent of the Sole Shareholder of ComScape Telecommunications of Raleigh–Durham, Inc." should have been executed by Telecommunications (which is the sole shareholder of Raleigh–Durham), but it was instead executed in the following

manner: "ComScape Telecommunications of Raleigh–Durham, Inc. By: Ghanshyam C. Patel, President." In other words, this Written Consent on its face was executed not by the sole shareholder of Raleigh–Durham, but by Raleigh–Durham itself. Many of the Written Consents were executed in this erroneous fashion. In addition, Ghany testified that the "Subsidiaries were treated pretty much alike," apparently conceding the lack of corporate formality at the level of the Subsidiaries.

As the Court will explain in more detail below, during a board of directors meeting of Holding held on August 7, 2006, Ghany was removed as the CEO and President of Holding and was removed as the Sole Director of each of the Debtors.

### B. Relevant Provisions of the Governing Documents of Holding

Section 4.01 of the Regulations provides that Holding's business and affairs and all corporate authority and powers shall be exercised by or under the authority of the Board of Directors, subject to limitations imposed by applicable corporate law, the Articles and the Regulations.

Section 4.03 of the Regulations states as follows:

*Term of Office.* The Directors shall be elected at each annual meeting of shareholders, or at a special meeting called for the purpose of electing Directors, or the Directors may be designated at any time by the unanimous written consent of the shareholders. Each Director shall hold office until the next annual meeting of the shareholders and until his successor is elected, or until his earlier resignation, removal from office, or death.

Section 4.04 of the Regulations provides in pertinent part that "[a]ny Director may resign at any time by giving notice to the Board of Directors or the Chief Executive Officer or Secretary, and such resignation shall be deemed to take effect upon its receipt by the person or persons to whom addressed, unless some other time is specified therein." Under § 4.05 of the Regulations, vacancies in the Board of Directors shall exist if, among other things, any Director resigns. Section 4.06 of the Regulations provides as follows regarding the filling of vacancies:

*Filling Vacancies.* Any vacancy occurring in the Board of Directors shall be filled by a majority of the remaining members of the Board, though less than a quorum, and each person so elected shall be a Director until his successor is elected by the shareholders.

Section 1 of the CCSA states in pertinent part that:

If any of the provisions of the Articles or of the Code of Regulations of the Company (the "Regulations"), as now in effect or as the same may be amended from time to time, are inconsistent with any of the provisions of this Agreement, such inconsistent provisions of the Articles and/or Regulations shall be suspended during the term of this Agreement, and the provisions of this Agreement shall be controlling. To the extent the provisions of the Articles and Regulations are not inconsistent with the provisions of this Agreement, such Articles and Regulations shall regulate the affairs of the Company and the relations of the Shareholders of the Company among themselves. . . .

The CCSA also addresses the topic of a vacancy on the board of directors. Paragraph 5.1 of the CCSA provides in pertinent part:

There shall be five directors of the Company. Ghanshyam C. Patel, Raman C. Patel, Jeremiah P. Byrne, Jay K. Jayanthan and Bhogilal M. Modi each will

serve as a Director of the Company until February 1, 1997. After February 1, 1997, the Directors shall be elected by the vote of the Shareholders. In the event that any Director is for any reason unable or unwilling to serve, the remaining Directors shall nominate an individual to serve instead of such retiring Director. Until such time as the vacancy is filled, the remaining Directors shall continue to act and their actions shall be valid.

In May 1997, the Board of Directors, in writing and without a meeting, adopted a resolution to amend Section 5.1 of the CCSA to provide as follows:

Until otherwise decided by the Company's Board of Directors in its sole discretion, there shall be five directors of the Company. Ghanshyam C. Patel, Raman C. Patel, Jeremiah P. Byrne, Jay K. Jayanthan, and Bhogilal M. Modi each will serve as a Director of the Company until such time that a Shareholders Meeting shall be convened for the purpose of electing Directors.... In the event that any Director is for any reason unable or unwilling to serve, the remaining Directors shall nominate an individual to serve instead of such retiring or departing Director. Until such time as the vacancy is filled, the remaining Directors may continue to act and their actions shall be valid.

Although this amendment arguably was adopted by the shareholders at a meeting in June 1997, Ghany insists that the amendment was not effective because it was not signed by shareholders holding 80% of the outstanding shares of each class of stock, as required by the CCSA. In any event, by the end of the hearing, the Movants ultimately were not relying on the amendment.

Ghany argues that the CCSA requires a shareholder vote to replace a departing director of Holding. As will be discussed below, however, Ghany had no objection to the Board acting at variance to that purported procedure on at least two occasions—one in 2003 and another in 2006—when the Board of Holding elected directors to replace resigning directors. At none of those meetings of the Board of Directors of Holding did Ghany object to the procedure of election of an additional Director by the then current directors, nor did he object to the elected person attending the meeting, participating in discussions, or voting on matters brought before the Board.

Other provisions of the Regulations that are relevant to this dispute include §§ 5.07, 7.04, 7.05 and 7.07(D). Section 5.07 states:

*Majority Action.* Every act or decision done or made by a majority of the Directors present at any meeting duly held at which a quorum [3] is present is the act of the Board of Directors. *Each Director who is present at a meeting will be conclusively presumed to have assented to the action taken at such meeting unless his dissent to the action is entered on the minutes of the meeting,* or, where he is absent from the meeting, his written objection to such action is promptly filed with the Secretary of the Corporation upon learning of the action. Such right to dissent shall not apply to a Director who voted in favor of such action.

Regulations § 5.07 (emphasis added).

Sections 7.04 and 7.05 provides as follows:

---

**3.** Section 5.06 of the Regulations states that "[a] majority of the number of Directors in office constitutes a quorum of the Board for the transaction of business."

7.04 *Removal and Resignation.* Any officer or agent may be removed by a majority vote of the Board of Directors; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed. Any officer may resign at any time by giving written notice to the Board of Directors or to the Chief Executive Officer, President, if any, or Secretary of the Corporation. . . .

7.05 *Vacancies.* If the office of the Chief Executive Officer, Secretary, Treasurer, Assistant Secretary, or Assistant Treasurer becomes vacant by reason of death, resignation, removal or otherwise, the Board of Directors may elect a successor to such office and shall do so if required by the Regulations.

In addition, § 7.07(D) of the Regulations states:

*Meeting of Other Corporations.* Unless otherwise directed by the Board of Directors, [the Chief Executive Officer shall] attend, in person or by substitute appointed by him or the President, or Secretary or Assistant Secretary, and act and vote, on behalf of the Corporation, at all meetings of the shareholders of any corporation in which this corporation holds stock.

## C. Relevant Provisions of the Debtors' Governing Documents

Each of the Debtors has in place a governing document that in certain instances is denominated as the "Code of Regulations" and in other instances as the "Bylaws" and which the Court will refer to collectively as the "Debtors' Bylaws." The Debtors' Bylaws are substantially similar to one another in all material respects. Section 4.01 of the Debtors' Bylaws provides that the business and affairs of each of the Debtors and all corporate authority and powers shall be exercised by or under the authority of the applicable Debtor's board of directors, subject to limitations imposed by applicable corporate law, the certificate of incorporation or applicable bylaws or regulations. Section 4.02 of each of the Debtors' Bylaws provides that the number of directors may be less than three, but not less than the number of shareholders. Because each of the Debtors is solely owned by another corporation, the Debtors' Bylaws effectively permit each of the Debtors to have a sole director. Each Debtor, however, is permitted to have more than one director.

Section 4.03 of each of the Debtors' Bylaws provides as follows:

The Directors shall be elected at each annual meeting of shareholders, or at a special meeting called for the purpose of electing Directors, or the Directors may be designated at any time by the unanimous written consent of the shareholders. Each Director shall hold office until the next annual meeting of the shareholders and until his successor is elected, or until his earlier resignation, removal from office, or death.

Section 4.04 of each of the Debtors' Bylaws provides that "[a]ny Director, Directors, or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of the voting shares then entitled to vote at an election of Directors." Debtors' Bylaws § 4.04. In each instance, "the holder[ ] of a majority of the voting shares then entitled to vote at an election of Directors" is either Holding (in the instance of the Tier One Debtors), Telecommunications (in the instance of the Tier Two Debtors) or another corporation within the corporate structure (in the instance of the Tier Three Debtors).

## D. Pre–2006 Events

Notwithstanding the procedures outlined in the CCSA and the Regulations,

Ghany had no objection to the Board acting at variance to outlined procedures when it suited him. Between 1995 and 2004, annual meetings of shareholders were not always held—they were not held in at least 1996, 2002 or 2004—and Board of Directors' Meetings were not held with regularity either. Notwithstanding the requirement of the CCSA, as amended, of five Directors, in March 2001, three directors of Holding then sitting on the Board resigned and were not replaced, leaving less than five directors. Only three Directors sat on the Board from 2001 until June 27, 2003. At the 2005 Shareholders' Meeting, only four Directors were elected. At each annual meeting, Holding's Board elected Byrne as corporate secretary and executive vice president *of all of the Subsidiaries.*

On June 27, 2003, a Special Meeting of the Board of Directors of Holding was held. At the time, there were only three members of the Board because back in 2001 three directors of Holding resigned and had not been replaced. Present at the meeting were "[a]ll of the directors of [Holding], namely [Byrne, Jayanthan and Ghany.]" Board of Directors Meeting Minutes—June 27, 2003 ("June 27 Board Minutes") at 1. In his role as Chairman, Ghany called the meeting to order and stated that the purpose of the meeting was, among other things, to consider the addition of Raman and Modi to the Board of Directors of Holding. After discussion and a recommendation by Ghany that they be brought onto the Board, a resolution was approved and adopted electing Modi and Raman as members of the Board. *See* June 27 Board Minutes at 2. In other words, Modi and Raman were elected to the Board by the Directors serving at that time. The election was never confirmed or ratified by the shareholders. At that time, the Board also elected Modi as secretary of Holding *and each of the Subsidiaries.*

### E. 2006 Events

By mid–2006, the relationship between various shareholders and directors had deteriorated significantly. Several meetings of the Board of Directors of Holding were held in June and July, at which disputes became increasingly heated. By July 18, 2006, Ghany had purportedly terminated Modi and Raman as corporate officers of Holding and had ejected them from the company offices. At some time between June 27, 2003 and July 18, 2006, Byrne had left and Subhash Kithany ("Kithany") had joined the Board of Holding. A Board of Directors meeting was held on July 18, 2006 at which Ghany, Raman, Modi, and Jayanthan were present as current directors of Holding. Kithany resigned and during the meeting the Directors voted to fill the vacancy on the Board created by his resignation by electing Byrne to again become a member of the Board. *See* Board of Directors Meeting Minutes—July 18, 2006 at 1. Neither at this meeting nor at any of the meetings of the Board of Directors of Holding discussed above did Ghany object to the procedure of election of an additional Director by the then current directors, nor did he object to the elected person attending the meeting, participating in discussions, or voting on matters brought before the Board.

After Byrne joined the Board as a director, the directors discussed at length Ghany's misfeasance and/or malfeasance as CEO of Holding and the related entities. Among other things, Ghany had locked up the corporate offices and refused normal access to the offices and corporate records by any of the other shareholders or directors, and had caused Holding to initiate litigation against Modi, Raman and Jayanthan. Unhappy with the direction the meeting was taking, Ghany stated that the Board could continue without him and

left the meeting. With four of the five directors remaining, his departure did not break quorum. At that point, the Board authorized retention of counsel for the company and for counsel to file suit against Ghany as a result of his actions. The Board further authorized retention of counsel in Ohio to defend the shareholder/directors in the litigation commenced by Ghany. After Ghany returned to the meeting, he was, among other things, directed by the Board to dismiss the lawsuit filed against Modi, Raman and Jayanthan.

On July 29, 2006, Modi, in his capacity as secretary of Holding, issued a notice signed by him and by Raman, Jayanthan and Byrne calling a Special Meeting of Holding's Board of Directors for Monday, August 7, 2006. The notice included agenda items stating that the directors intended "to consider any replacement(s) for the Board of Directors because of a vacancy(s) resulting from resignation(s) of current Directors," "[t]o consider the continued employment of the President and CEO [Ghany]" and "[t]o transact such other business as may properly come before the Board or any adjournment thereof."

According to the Minutes of Meeting of the Board of Directors of ComScape Holding Inc. for August 7, 2006 ("August 7 Minutes"), the meeting commenced on that date with Modi, Raman, Jayanthan, Ghany and Byrne as the initial attendees. No one objected to or protested the notice, the agenda set forth in the notice, or the meeting. Ghany began the meeting presiding as Chairman, while Modi acted as Secretary for the meeting. At that time, Ghany was CEO of Holding. Quorum being present, Ghany called the meeting to order.

After Ghany announced that certain attorneys were listening in on a wireless phone and that Ghany was recording the meeting, the Board of Directors passed a resolution ordering him to turn off his cell phone and the recording device. Ghany ignored the resolution.

Thereafter, Jayanthan, Raman and Modi resigned one after the other as members of the Board of Directors of Holding and were replaced by other individuals. First, Jayanthan submitted his resignation, effective immediately, to Modi as Secretary. The remaining members of the Board of Directors voted to fill the vacancy created by Jayanthan's resignation by electing Suguneswaran S. Suguness ("Suguness") as a director of Holding.[4] Suguness joined the meeting. Raman then submitted his resignation, effective immediately, to Modi as Secretary. The remaining members of the Board of Directors voted to fill the vacancy created by Raman's resignation by electing Edward L. Beer ("Beer") as a director of Holding.[5] Beer joined the meeting. Modi then submitted his resignation as a director of Holding, effective immediately, to Ghany. The remaining members of the Board of Directors voted to fill the vacancy created by Modi's resignation by electing Ranjan Manoranjan ("Manoranjan") as a director of Holding.[6] Manoranjan joined the meeting.

A motion was then made to elect a new Chairman of the Board, and Manoranjan was elected to that position. Other than voting no, Ghany did not object to the elections, did not indicate that the elections were out of order, did not try to refuse admittance to the newly elected directors and did not tell the newly elected directors

---

**4.** Byrne, Modi and Raman voted "yes," and Ghany voted "no."

**5.** Byrne, Modi and Suguness voted "yes" and Ghany voted "no."

**6.** Byrne, Suguness and Beer voted "yes," and Ghany voted "no."

that they could not serve because the election was improper. Ghany, however, did state that he was adjourning the meeting and departed. However, there was no motion to adjourn or any vote as required by the Regulations of Holding, so the meeting continued without him.

To say that the remaining directors were unhappy with Ghany's performance as President and CEO of Holding is an understatement. The list of infractions by Ghany are set forth in the minutes of the meeting and were numerous. The Board voted to terminate for cause the Employment Agreement between Ghany and the company as well as to remove him as President and CEO of Holding and each of its affiliates, effective immediately.[7] Byrne also was elected CEO of all Subsidiaries. The Board also elected Byrne as CEO of Holding effective immediately. These actions were consistent with §§ 7.04 and 7.05 of the Regulations.

The last item addressed at the August 7 meeting was reported as follows:

[Suguness] stated that we need to have a shareholders meeting for all ComScape affiliates to remove the present director [Ghany] and to nominate and elect a new, sole director without a notice for the meeting.

[Manoranjan] asked for a motion to: (1) remove Ghany as the sole director of all of the affiliate companies of ComScape; (2) Elect [Modi] as sole director of each of these Companies and; (3) take all of these actions without a meeting nor a notice of a meeting.

A motion duly made and seconded, the following resolution was approved and adopted:

**RESOLVED,** (1) remove Ghany as the sole director of all of the affiliate companies of ComScape; (2) Elect [Modi] as sole director of each of these Companies and; (3) take all of these actions without a meeting and waiving a right to a notice of a meeting.

August 7 Minutes at 6. Suguness, Manoranjan and Beer voted in favor of this action. Byrne voted against the resolution due in part to a desire to avoid litigation against him related to the Employment Agreement with Ghany. The meeting was then properly adjourned.

### F. 2007 Events

Modi remained the corporate secretary of Holding. In 2007, Ghany had his assistant contact Modi to execute documents necessary to transfer some stock. Modi explained to the assistant that in order to perform this function, he needed to review the corporate records. Ghany refused to allow this and Modi declined to execute the documents in order to effect the transfer. Ghany treated Modi's action as an abandonment of the secretarial office; however, Modi has not resigned. Nonetheless, Ghany purportedly appointed one Lisa Kuhn as acting secretary to carry out his wishes. However, he failed to notify anyone of this action, including Modi. Ghany suggests that his appointment of Lisa Kuhn as Acting Corporate Secretary was proper under § 7.04 of the Regulations. However, the

---

7. On June 1, 1996, Ghany and Holding entered into an Employment Agreement that included an annex signed by Raman, Byrne, Jayanthan and Modi by which those individuals agreed that "to the extent [Ghany] shall serve as a director of [Holding], he will vote for [Ghany] to serve as Chairman of the Board of Directors and CEO." Ghany apparently believes that the Employment Agree-

ment and annex provided him the right to serve as CEO for as long as he wished. Ghany's reliance on the Employment Agreement is misplaced. No agreement among the parties could absolve the directors of their fiduciary duties as members of the Board to exercise their business judgment in service of Holding and its shareholders.

Regulations are clear that only a majority of the Board of Directors has authority to appoint a corporate secretary. Section 7.04 of the Regulations provides that an officer may be removed only by majority vote of the Board of Directors; therefore, the effort by Ghany to fire Modi as Corporate Secretary was invalid.

On February 16, 2007, the Annual Meeting of Shareholders of Holding was held. Manoranjan presided as Chairman and Modi was designated Secretary for the meeting. Ghany appeared at the meeting and did not object to the meeting or the notice thereof or otherwise interpose any hurdle to the meeting. In fact, he participated in and voted on issues brought before the shareholders until asked to leave. Interestingly, he did not bring up the subject of the "acting secretary" or suggest that Modi lacked authority to act as secretary. He did, however, announce that he was tape recording the meeting. The meeting was called to order and quorum confirmed by Modi as secretary. The Chairman called for a motion prohibiting recording the proceedings. A majority of the shareholders voted in favor of the motion; however Ghany refused to comply. The Chairman then asked Ghany to leave the meeting; this he also refused until hotel management arrived and asked him to leave, which Ghany did.

Elected as Directors at the meeting for the term of one year, or until successors are duly elected and qualified, were Beer, Manoranjan, Suguness, Byrne and Ghany. Despite dissatisfaction with his performance at the helm of the company, the directors believed that Ghany had valuable experience and talents that could benefit the company and felt that he still could contribute to the company as a member of the Board of Holding. The Shareholders also ratified the action taken by the Board of Directors in the meeting of August 7, 2006 in terminating the Employment Agreement with Ghany. *See* ComScape Holding Inc. 2008 Annual Meeting of Shareholders, Special Meeting of Shareholders, Certificate of Inspector of Elections—May 16, 2008.

### G. 2008 Events

On May 16, 2008, a meeting described both as the 2008 Annual Meeting of Shareholders and a Special Meeting of Shareholders was held. Ghany did not personally attend but sent an attorney on his behalf. A Certificate of the Inspector of Elections confirmed that quorum was present and that Beer, Manoranjan, Suguness, Byrne and Ghany were again elected directors. The Certificate was approved by the shareholders. Additionally, the shareholders ratified (1) the commencement of a lawsuit by Holdings against Ghany pending in the Palm Beach County, Florida Circuit Court, (2) the dismissal of a lawsuit against Ghany pending in the Richland County, Ohio Court of Common Pleas, (3) termination of the Employment Agreement between Ghany and Holding as of August 7, 2006, and (4) removal of Ghany as President of Holding.

On May 12, 2008, Ghany sent a letter to shareholders notifying them of a shareholders' meeting to be held on June 27, 2008 and enclosing a notice issued by his acting corporate secretary, Lisa Kuhn. Present at the meeting were Ghany, attorney Jonathan Yarger, the purported acting secretary Lisa Kuhn, Jayanthan, Modi, attorney David Kovach and one Mr. Cuculis and his son. After calling the meeting to order, Yarger noted that quorum was present. At the commencement of the meeting, Jayanthan and Modi objected to the meeting on the basis that the meeting had not been noticed properly, was scheduled for a date outside the time frame dictated by the Regulations, was duplica-

tive of the shareholders' meeting held on May 16, 2008, and because Ghany was not authorized to call, schedule or notice any meeting of shareholders. Notwithstanding their objections, Jayanthan (who controlled 60% of the A class shares and 68% of the C class shares) and Modi intended to participate in the meeting, which they envisioned would include a change in the slate of directors, election of the same directors as had been elected at the May meeting, and approval of the payment of attorney fees in connection with the litigation in which the parties were embroiled. They also intended to vote on other matters which had been set forth as agenda items in Ghany's letter. However, without discussion or determining the intentions of the objecting parties, Yarger then stated that quorum had been broken because of the protests. At that point, without motion or vote, Ghany adjourned the meeting until July 11, 2008. Interestingly, the Regulations state in Section 3.11 that:

> In the absence of a quorum or *with the withdrawal of enough shareholders to leave less than a quorum,* any meeting of shareholders may be adjourned from time to time by the vote of a majority of the shares ... but no other business may be transacted.

(Emphasis added). Jayanthan and Modi merely protested the Meeting, but did not withdraw, leave the Meeting or otherwise indicate that they would not participate.

On July 11, 2008, Ghany again attempted to hold a shareholders' meeting. Present at this attempt were Ghany, Yarger, Kuhn, Jayanthan, Modi, Kovach and two of Ghany's sons. Again, Yarger noted that quorum was present until the meeting was protested by Jayanthan and Modi on the same basis as the previous meeting in June. Again, Yarger stated that because of the protest, quorum was broken, although the protesting parties had not left the

meeting or otherwise indicate that they did not intend to participate. Again, without vote of the shareholders as required by the Regulations, Ghany adjourned the meeting. The meeting was never reconvened.

### H. The Commencement of these Cases

Petitions for Relief under Chapter 11 of the Bankruptcy Code were filed by each of the Debtors on the Petition Date. Attached to each Petition is a document titled "Action by Written Consent of the Sole Member of the Board of Directors ..." dated February 4, 2009 and signed by Ghany, purportedly as the sole member of the Board of Directors of the entity that filed the Petition. The document purports to grant the Debtor and its officers authority to institute the bankruptcy proceeding.

### III. Conclusions of Law

### A. Authorization to Commence a Bankruptcy Proceeding

■ Holding and Modi request dismissal of these Chapter 11 cases under § 1112(b)(1) of the Bankruptcy Code, which states:

> [O]n request of a party in interest, and after notice and a hearing ... the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *if the movant establishes cause.*

11 U.S.C. § 1112(b)(1) (emphasis added). It is well established that lack of authority to commence a bankruptcy case constitutes cause for dismissal. *See In re A–Z Elec., LLC,* 350 B.R. 886, 891 (Bankr.D.Idaho 2006) (holding that § 1112(b) provided grounds for dismissal of case filed by individual who lacked authority to file the petition on behalf of the debtor company); *In re Real Homes, LLC,* 352 B.R. 221, 225 (Bankr.D.Idaho 2005) (same); *In re J&J Prop. Holdings, LLC,*

2004 WL 5463804 at *2 (Bankr.W.D.N.C. Jan.20, 2004) (same).

■ However, the Court need not rely on § 1112(b) for authority to dismiss this case. Whenever a court "finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition." *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945). The Court, therefore, would be required to dismiss an unauthorized filing even if § 1112(b) were not in the Bankruptcy Code. *See In re Southern Elegant Homes, Inc.*, 2009 WL 1639745 at *1 (Bankr. E.D.N.C. June 9, 2009) (dismissing unauthorized petition without relying on § 1112(b)); *In re N2N Commerce, Inc.*, 405 B.R. 34, 41 (Bankr.D.Mass.2009) (same); *In re Telluride Income Growth Ltd. P'ship*, 311 B.R. 585, 591 (Bankr. D.Colo.2004) (same); *Kelly v. Elgin's Paint & Body Shop, Inc. (In re Elgin's Paint & Body Shop, Inc.)*, 249 B.R. 110, 112 (Bankr.D.S.C.2000) (same).

■ Generally, the burden of proof to demonstrate cause under § 1112(b) lies with the movant. *See Bal Harbour Club, Inc. v. AVA Dev., Inc. (In re Bal Harbour Club, Inc.)*, 316 F.3d 1192, 1195 (11th Cir. 2003) ("[I]n the litigation of a motion brought under section 1112(b) to dismiss a Chapter 11 petition ... the movant ... had the burden of proof."); *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) ("Where a motion to dismiss for cause is opposed, the movant bears the burden of proving by a preponderance of the evidence that cause exists for dismissal of the debtor's bankruptcy case."); *Wahlie*, 417 B.R. at 11 ("The party seeking dismissal or conversion under § 1112 bears the burden of proving, by a preponderance of evidence, that 'cause' exists.").

■ Where the burden of proof should lie in a case of an alleged unauthorized filing presents a closer question given that, under the Supreme Court's *Price* decision, the Court would have no choice but to dismiss an unauthorized petition even if § 1112(b) itself did not require such dismissal. Certain courts have held that the burden of proof should shift to the debtor if the movant establishes a prima facie case that the party filing the petition lacked authority. *See Real Homes, LLC*, 352 B.R. 221 at 227–28 ("Once [the movant's] exhibits and her affidavit testimony were admitted, all without objection, a *prima facie* case was made. Debtor thereafter bore the burden of proving the filing was authorized and proper."). Other courts, however, have placed the burden of proof entirely on the movant. *See In re Player Wire Wheels, Ltd.*, 421 B.R. 864, 868–69 (Bankr.N.D.Ohio 2009) (placing burden of proof on the movant on motion to dismiss based on an unauthorized filing). Because the Court does not take the issue of dismissal lightly, the Court will place the burden of proof entirely on the Movants to demonstrate by a preponderance of the evidence that the Debtors' bankruptcy cases were unauthorized.

■ Commencement of a case under the Bankruptcy Code "is a specific act requiring specific authorization." *N2N Commerce*, 405 B.R. at 41 (internal quotation marks omitted). It also is well-settled that applicable state law determines whether a bankruptcy filing was authorized. *See Price*, 324 U.S. at 106, 65 S.Ct. 513 (holding that those "who purport to act on behalf of the corporation" must have "been granted authority by local law to institute the proceedings"); *In re Corporate & Leisure Event Prods., Inc.*, 351 B.R. 724, 731 (Bankr.D.Ariz.2006) ("It is of course true that bankruptcy courts generally look to state law to determine who is authorized to

file a voluntary petition for a corporation, partnership or other kind of organizational entity."); *Union Planters Nat'l Bank v. Hunters Horn Assocs. (In re Hunters Horn Assocs.),* 158 B.R. 729, 730 (Bankr. M.D.Tenn.1993) ("The general rule has emerged that authority to bind an entity to a voluntary petition in bankruptcy is determined by state law.").

■ One prong of the Movants' argument for dismissal set forth in the Motion is that Holding did not authorize the filing of the Petitions for Relief. However, "[i]t is beyond cavil that modern American corporations invoke the protection of the bankruptcy laws without obtaining shareholder votes." *In re Teacorp, Inc.,* 2007 WL 1404424 at *3 (Bankr.S.D.Tex. Feb.7, 2007). Rather, it is generally true that the board of directors has the authority to commence a bankruptcy case on behalf of a corporation. *See N2N Commerce,* 405 B.R. at 41 (" 'In virtually every instance, th[e] authority [to commence a bankruptcy case] has been held to rest solely with the board of directors.' ") (quoting *In re Arkco Props., Inc.,* 207 B.R. 624, 628 (Bankr. E.D.Ark.1997)); *In re Runaway II, Inc.,* 159 B.R. 537, 538 (Bankr.W.D.Mo.1993) ("[H]istorically it has always been true, even before the Bankruptcy Reform Act of 1978, that a valid resolution of the Board of Directors of a corporation was a prerequisite to the filing of a voluntary petition in bankruptcy by a corporation."); *In re Giggles Rest., Inc.,* 103 B.R. 549, 553 (Bankr. D.N.J.1989) ("[I]t is clear that any corporate resolution which authorizes the filing of a voluntary bankruptcy petition must originate at a validly held meeting of directors and must be approved by the proper number of such directors."); *In re Moni–Stat, Inc.,* 84 B.R. 756, 757 (Bankr. D.Kan.1988) ("[T]he law is clear that the decision of whether [or] not a corporation should file bankruptcy is a business deci-

sion to be made only by the board of directors."). *See also generally* 9A Am. Jur.2d Bankruptcy § 894 (2009) ("The authority to file a bankruptcy petition generally rests with the corporation's board of directors, which may authorize and delegate the action to officers of the corporation, at a validly held meeting of directors and approved by the proper number of directors.") (footnote omitted).

The grounds for the general rule include (1) the governing corporate documents, which typically provide that the business of the corporation will be managed by or under the direction of the board of directors and (2) applicable state law, which likewise typically provides for governance by the board. *See N2N Commerce,* 405 B.R. at 41 (citing a state statute under which "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors" and noting that " '[s]tatutes with similar language have been held to authorize the board of directors to file a petition in bankruptcy.' ") (quoting *Arkco,* 207 B.R. at 628); *In re Milestone Educ. Inst., Inc.,* 167 B.R. 716, 720 (Bankr.D.Mass.1994) ("[T]he authority to file a bankruptcy petition depends upon the corporate documents and state law[.]").

■ This general rule applies in the instance of these bankruptcy cases. As noted above, § 4.01 of each of the Debtors' Bylaws provides that the Debtors' business and affairs and all corporate authority and powers shall be exercised by or under the authority of the Board of Directors. This provision is consistent with applicable state law. As of the Petition Date, each of the Debtors was incorporated in either Ohio, Delaware or North Carolina, so the laws of those states govern. *See In re De Camp Glass Casket Co.,* 272 F. 558, 561 (6th Cir.1921) (holding that the authority to file a voluntary petition in bankruptcy

on behalf of a corporation depends on the laws of the state in which the corporation is organized, subject to the corporation's constituent documents). The laws of each of those states provides for corporate governance by the board of directors. *See* Ohio Rev.Code Ann. § 1701.59(A) (West 2009); Del.Code Ann. Tit. 8, § 141 (West 2009); N.C. Gen.Stat. Ann. § 55–8–01(b) (West 2009). In addition, courts have held that the power of corporate governance by the board of directors under the law of each of these states includes the power to authorize a bankruptcy filing. *See In re Ann Arbor Mach. Corp.*, 274 F. 24, 28 (6th Cir.1921) (applying Delaware law); *In re S. & S. Mfg. & Sales Co.*, 246 F. 1005, 1006 (N.D.Ohio 1917) (applying Ohio law); *In re A–K Enters., Inc.*, 111 B.R. 149, 150 (Bankr.N.D.Ohio 1990) (applying Ohio law); *Southern Elegant Homes*, 2009 WL 1639745 at *1 (applying North Carolina law). A bankruptcy filing is unauthorized if the board of directors purporting to authorize it was not lawfully constituted and acting lawfully in so doing. *See* 9A Am.Jur.2d Bankruptcy § 894 ("[T]he board of directors must be lawfully constituted and acting lawfully when authorizing the filing of a petition."). In addition, "[a]n officer or an individual director cannot properly file a petition for the voluntary bankruptcy of a corporation unless authorized by the board of directors." 15A Fletcher Cyc. Corp. § 7631.39 (2009). If a board of directors has multiple members, a single director has no authority to file a bankruptcy petition on behalf of corporation. *See Moni–Stat*, 84 B.R. at 757 ("Simply put, there must be a majority vote of a quorum of the board of directors to file a corporate bankruptcy. . . ."); *Runaway II*, 159 B.R. at 538.

The Court finds no basis in applicable law or in the Debtors' Bylaws or other governing documents that would permit anyone, other than the duly elected board of directors of each of the Debtors, to authorize the commencement of voluntary bankruptcy cases on behalf of the Debtors. Because Ghany purported to authorize these cases as the sole member of the board of directors of each of the Debtors, the Court must decide whether Ghany was, as the Movants contend, in fact not the sole director.

### B. The Movants Have Carried Their Burden

For the reasons stated below, the Court concludes that the Movants have carried their burden of proving by a preponderance of the evidence that Ghany was not the sole director of the Debtors at the time he purported to authorize their bankruptcy cases.

### 1. The Resignation and Replacement of Directors of Holding

The question is whether the Board of Directors of Holding that voted on August 7, 2006 to remove Ghany and elect Modi as the sole director of the Debtors was duly constituted. The Court concludes that the Board of Directors of Holding, consisting of Byrne, Suguness, Beer, Manoranjan and Ghany, was duly constituted at that time.

To the extent that they are not inconsistent with the CCSA, the Regulations govern the affairs of Holding. Every pertinent action that the Board or its members took on August 7, 2006 was taken in accordance with the Regulations and the CCSA. Three directors resigned effective immediately under § 4.04 of the Regulations, a provision that no one contends is inconsistent with the CCSA. As each director resigned, the resulting vacancy was "filled by a majority of the remaining members of the Board" pursuant to § 4.06 of the Reg-

ulations.[8] The Regulations further provide that each director so elected "shall be a Director until his successor is elected by the shareholders." Regulations § 4.06. Therefore, each individual who replaced a resigning director immediately became a director of Holding and was qualified to vote at the meeting of the Board that was then taking place.

The Debtors contend that § 4.06 of the Regulations is inconsistent with procedures set forth in the CCSA under which the remaining directors *nominate* replacement directors and the shareholders of Holding *elect* the directors so nominated. The Court, however, concludes that the Regulations and the CCSA are not inconsistent in this regard. As one would expect, the CCSA does not define the word "inconsistent." "Where a term is not defined in the contract, the court may refer to a dictionary definition." *R.M.D. Corp. v. Caliber One Indem. Co.*, 194 Fed.Appx. 409, 411 (6th Cir. Sep.12, 2006). In a relatively recent case, the Sixth Circuit referred to the Merriam–Webster Online Dictionary, *see Never Tell Farm, LLC v. Airdrie Stud, Inc.*, 123 Fed.Appx. 194, 198 (6th Cir. Feb.11, 2005), and this Court therefore will also rely on that resource. The Merriam–Webster Online Dictionary defines inconsistent as follows: "lacking consistency: as a: not compatible with another fact or claim ... b: containing incompatible elements ... c: incoherent or illogical in thought or actions[.]" *See* Merriam–Webster Online Dictionary, available at http://www.merriam-webster.com/dictionary. In turn, "consistency" means "agreement or harmony of parts or features to one another or a whole: correspondence; *specifically:* ability to be as-

serted together without contradiction[.]" *Id.* Thus, the provisions of the CCSA and the Regulations are not inconsistent if they can be harmonized.

The Court concludes that the provisions can readily be harmonized. Together, § 5.1 of the CCSA and § 4.06 of the Regulations provide a framework under which the shareholders have the power to elect directors and the remaining directors also have the power to elect directors in the event of a vacancy on the Board. There is nothing inconsistent about that framework. In § 4.03, the Regulations themselves provide for the election of directors by shareholders. Therefore, if the Debtors were correct that the Regulations are inconsistent with the CCSA, then the Regulations would be inconsistent with themselves. Of course, the individuals elected to the Board by other directors ultimately could be replaced at an election by the shareholders.

Contrary to the Debtors' position, the provision of the CCSA under which directors "nominate" individuals to fill vacancies is not inconsistent with § 4.06 of the Regulations for at least two reasons. First, "nominate" can mean "appoint or propose for appointment to an office or place" or "to propose as a candidate for election to office[.]" Merriam–Webster Online Dictionary. In other words, the term "nominate" can mean either to propose for appointment or to actually appoint. Second, even if the meaning of the word "nominate" were limited to the act of proposing the individual for another's consideration, § 4.06 of the Regulations would not be inconsistent with the CCSA. Con-

---

**8.** This action also was consistent with the Ohio Revised Code, which provides that, in the event of a vacancy on a board of directors "[u]nless the articles or the regulations otherwise provide, the remaining directors, though less than a majority of the whole authorized number of directors, may, by the vote of a majority of their number, fill any vacancy in the board for the unexpired term." Ohio Rev.Code Ann. § 1701.58(F).

strued together, the CCSA and the Regulations provide the directors the power to nominate a candidate to fill a vacancy or the power to actually fill the vacancy, with the power they exercise to be chosen at their discretion. In other words, the Regulations and the CCSA can reasonably be construed together to mean that, in the event of a vacancy on the Board, the directors may choose to propose an individual for shareholder consideration or may actually vote to fill the vacancy. Of course, the Board's decision about who to elect to fill a vacancy eventually would be subject to being undone by subsequent shareholder action because it is the shareholders whose voice ultimately controls on the issue of who shall be the directors of Holding going forward. However, the shareholders of Holding did not undo the elections of Suguness, Beer and Manoranjan the next time they had an opportunity to do so at the meeting of shareholders in 2007, but instead elected the same slate of directors for another term. The prior practice of election of successor directors by the then current remaining directors of Holding and the apparent acquiescence of the shareholders of Holding in that practice confirms the Court's interpretation of how the CCSA and the Regulations work together. In addition to looking to the dictionary definition of a term, "[w]here a contract provides little guidance in interpreting a disputed term, [the Court] may properly look to ... how the parties' actions during the pendency of the agreement have reflected an understanding of the term[.]". *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 586 (6th Cir. 2001). Accordingly, it is highly relevant that (a) on at least two occasions prior to August 7, 2006 the Board of Directors of Holding elected individuals to fill vacancies on the Board without a vote of the shareholders and (2) the shareholders did not balk at such action. This further confirms

the Court's conclusion that the provisions of the Regulations and the CCSA are consistent as they relate to the election of directors by the Board in order to fill vacancies created by the resignation of directors.

The parties addressed at some length the actions the shareholders of Holding took or did not take in 2007 and 2008 after the August 7, 2006 meeting of the Board of Directors of Holding. Nothing the shareholders did or did not do after August 7, 2006 changes the Court's conclusion. First, even if the shareholders of Holding had elected different directors to the Board of Holding or had declined to ratify the elections that had taken place, any valid actions that the directors took during the August 7, 2006 meeting while they were directors would remain valid. *See, e.g., Wynco Distrib., Inc. v. Wynn (In re Wynco Distrib., Inc.)*, 126 B.R. 131, 132 (Bankr.D.Mass.1991) ("The removal of directors does not itself invalidate acts those directors took while they were directors."); *Republic Corp. v. Carter*, 22 A.D.2d 29, 253 N.Y.S.2d 280, *aff'd*, 15 N.Y.2d 661, 255 N.Y.S.2d 875, 204 N.E.2d 206 (N.Y.App. Div.1964); 9A Am.Jur.2d Bankruptcy at § 894 ("[R]emoval of directors does not itself invalidate the acts of those directors that took place prior to their removal[.]"). In other words, if Suguness, Beer and Manoranjan validly voted to remove Ghany and elect Modi as the sole directors of the Debtors (an issue to be discussed below), their votes would have remained valid even if the shareholders had later removed them as directors. Moreover, the shareholders later re-elected them as directors.

In summary, § 4.06 of the Regulations is entirely consistent with § 5.1 of the CCSA. In addition, the custom and practice was for current directors to replace resigning directors, and the shareholders acquiesced in that practice. Thus, as discussed below,

even if the Regulations were not consistent with CCSA, the Court would nonetheless find that the Regulations and the CCSA had been effectively amended to permit the parties to act in accordance with prior custom and practice. For all of these reasons, the Court finds that Suguness, Beer and Manoranjan were properly elected to the Board of Holding and were qualified to vote during the Board meeting on August 7, 2006. Thus, the Court concludes that the Board of Directors of Holding was duly constituted when it voted to remove Ghany and elect Modi as the sole director of the Debtors.

### 2. The Removal of Ghany as the Sole Director of the Tier One Debtors

 The next issue is whether the actions of the Board of Directors in removing Ghany and electing Modi as the sole director of each of the Tier One Debtors was valid.[9] For the reasons stated below, the Court concludes that Ghany was properly removed and Modi was properly elected as the sole director of the Tier One Debtors.

Section 4.04 of each of the Debtors' Bylaws provides that "[a]ny Director, Directors, or the entire Board of Directors may be removed, with or without cause, *by the holders of a majority of the voting shares then entitled to vote at an election of Directors*." Debtors' Bylaws § 4.04 (emphasis added). In the instance of the Tier One Debtors, "the holder[ ] of a majority of the voting shares then entitled to vote at an election of Directors" is Holding. As already discussed above, the business and affairs of a corporation such as Holding are managed by or under the control of the Board of Directors. On August 7, 2006, a majority of the duly

constituted board of directors of Holding voted to remove Ghany as the sole director of the Tier One Debtors. Ghany, therefore, was properly removed in a manner consistent with the governing documents of the Tier One Debtors. The removal also was consistent with governing law (which in the instance of Telecommunications is Ohio and in the instance of Communications, Delaware). *See* Ohio Rev. Code Ann. § 1701.58(C) (West 2009) ("[A]ll the directors, all the directors of a particular class, or any individual director may be removed from office, without assigning any cause, by the vote of the holders of a majority of the voting power entitling them to elect directors in place of those to be removed[.]"); Del.Code Ann. Title 8 § 141(k) (West 2009) ("Any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors....").

It bears noting that Byrne, in his capacity as a director of Holding, voted against Ghany's removal as a director of the Subsidiaries. Interestingly, Byrne also became the CEO of Holding during the August 7, 2006 meeting. Although it is true that the CEO has authority under § 7.07(D) of the Regulations to "act and vote, on behalf of the Corporation, at all meetings of the shareholders of any corporation in which this corporation holds stock," the provision applies "[u]nless otherwise directed by the Board of Directors[.]" Regulations § 7.07(D). In this instance, the Board voted to remove Ghany itself rather than have the CEO act.

The Debtors contend that, under the Debtors' Bylaws, the sole director could be removed only by vote of the Debtor's

---

9. Recall that the Tier One Debtors are Communications and Telecommunications, both wholly owned by Holding.

shareholder(s) at a meeting of the shareholder acting as shareholder or by written consent of the shareholder. That, however, misconstrues what the Debtors' Bylaws provide. Under the Debtors' Bylaws, any Director may be removed by that particular Debtor's shareholder, which in the case of the Tier One Debtors is Holding. Again, Holding removed Ghany by taking action in a manner consistent with applicable law and Holding's governing documents—through a vote of its Board of Directors. It would make no sense to say that the Board of Directors must then take that action again at a meeting of the shareholder of the Tier One Debtors (*i.e.*, another meeting of Holding itself) or in a written action by Holding in its capacity as shareholder of the Tier One Debtors. Because it is so abundantly clear that Ghany was validly removed as the sole director of the Tier One Debtors (and therefore had no power to authorize their cases), the Court need not address whether Modi was validly elected as the sole director of the Tier One Debtors. It could be the case that the Tier One Debtors had a sole director (Modi) or had no director at all, but in any event Ghany certainly was not a director of the Tier One Debtors at the time he purported to authorize their bankruptcy cases.

Inasmuch as Ghany was not a director of the Tier One Debtors (let alone the sole director) at any time after August 7, 2006, he could not have authorized the filing of their bankruptcy cases. The Court, therefore, concludes that the bankruptcy cases of the Tier One Debtors were unauthorized.

### 3. *Removal and Election With Respect to the Tier Two and Tier Three Debtors*

█ The Court will now turn to the other Debtors. Although the Tier Two Debtors [10] and the Tier Three Debtors [11] present a closer question, the Court concludes that the Movants have carried their burden of proving by a preponderance of the evidence that those Debtors' cases also were unauthorized.

The Court will first address the purported removal of Ghany as the sole director of the Tier Two Debtors and the Tier Three Debtors. As with the bylaws of the Tier One Debtors, under § 4.04 of each of the Debtors' Bylaws for the Tier Two Debtors and the Tier Three Debtors, a director "may be removed, with or without cause, by the holders of a majority of the voting shares then entitled to vote at an election of Directors." In the instance of the Tier Two Debtors, "the holder[ ] of a majority of the voting shares then entitled to vote at an election of Directors" is Telecommunications. Again, the business and affairs of a corporation such as Telecommunications are managed by or under the control of the Board of Directors. On August 7, 2006, a majority of the duly constituted board of directors of Holding removed Ghany and voted to elect Modi as the sole director of the board of Telecommunications. During the August 7, 2006 meeting, Modi: (1) voted in favor of a resolution that Ghany turn off his phone and recording device, (2) received the resignations of Jayanthan and Raman, (3) voted in favor of the election of Suguness and Beer to the Board of Directors of Holding, (4) submitted his resignation as a member of the

---

**10.** The Tier Two Debtors are Raleigh–Durham and Wilmington, both wholly owned subsidiaries of Telecommunications.

**11.** The Tier Three Debtors are Raleigh–Durham License, Wilmington License, Jacksonville License and New Bern License, each a wholly owned subsidiary of a subsidiary of Telecommunications.

Board of Directors of Holding and (5) acted as Secretary of the meeting. There is no evidence that Modi took any action during the August 7, 2006 meeting to remove Ghany as a director of the Tier Two Debtors. Nor is there any evidence that Modi took action to remove Ghany at any time after the meeting. As discussed above, according to custom, the Board of Directors of Holding *elected* directors at all three tiers. There was, however, no evidence of any such custom for *removing* directors at the second and third tiers.[12] In his capacity as the sole director of Telecommunications, Modi could have—probably would have if he had thought to do so—removed Ghany as a director of the Tier Two Debtors, but there is no evidence that he actually ever did so. It appears, therefore, that Ghany remained a director of the Tier Two Debtors. Because Ghany was a director (along with Modi) of the Tier Two Debtors, it would have taken Ghany's vote as well as Modi's to remove Ghany as a director of the Tier Three Debtors. Accordingly, it appears that Ghany also remained a director of the Tier Three Debtors.

This does not mean, however, that the bankruptcy cases of the Tier Two Debtors or the Tier Three Debtors were authorized. They were not. The Debtors' Bylaws for the Tier Two Debtors and the Tier Three Debtors were effectively amended by custom and practice to provide for the election of directors at meetings of the Board of Directors of Holding. The Court concludes that Modi was validly elected as a director of the Tier Two Debtors and the Tier Three Debtors. True, like Holding's Regulations and the Tier One Debtors' Bylaws, the Tier Two and Tier Three Debtors' Bylaws provide that

the Directors shall be elected at each annual meeting of shareholders or at a special meeting called for the purpose of electing Directors, that the Directors may be designated at any time by the unanimous written consent of the shareholders and that a vacancy can be filled by a majority of the remaining members of the Board. The Debtors' Bylaws provide those things because the Debtors' Bylaws were essentially copied from the Regulations wholesale. But strictly following those provisions makes little sense in practice when the sole shareholder is another corporation—a fact that the directors themselves appear to have recognized. Jayanthan and Byrne, whom the Court found to be credible, both testified that Ghany was elected as a director of each of the Debtors at all three tiers, by the Board of Directors of Holding, at meetings of that Board, at which Ghany was present and voted. Ghany himself appeared to concede that the directors of the Subsidiaries were elected through action taken at annual meetings of Holding's Board, albeit memorialized in the Written Consents. Ghany also testified that the Subsidiaries were all treated alike. Courts in Delaware, Ohio and North Carolina as well as other states consistently have held that corporate bylaws may be amended by custom and usage of the directors and shareholders (which here would be Holding and the Debtors, acting through their Board of Directors). *See Dousman v. Kobus,* 2002 WL 1335621 at *4 (Del.Ch. June 6, 2002) ("Ordinarily, a corporate by-law may be amended by implication and without any formal action being taken by clear proof of a definite and uniform custom or usage, not in accord with the by-laws regularly adopted, and by acquiescence therein; but usually the course of conduct relied on to

12. Ghany testified that the Board of Directors of each of the Subsidiaries at one time was comprised of more than one director. There was, however, no evidence of how the boards were reduced to one (*e.g.,* resignation or removal of the directors at the subsidiary level).

effect the change must have continued for such a period of time as will justify the inference that the stockholders had knowledge thereof and impliedly consented thereto.") (citing *In re Ivey & Ellington, Inc.*, 42 A.2d 508, 509 (Del.Ch.1945)); *Ickes v. Macedono–Bulgarian Nat. Home on Macedonian Patriotic Org.*, 1988 WL 110882 at *5 (Ohio Ct.App. Oct. 19, 1988) (George, J., concurring in part and dissenting in part); *Casey v. Ohio State Nurses Ass'n*, 114 N.E.2d 866 (Ohio Ct.App.1951); *Kramer v. Kramer Bros. Foundry Co.*, 1918 WL 1192 at *5 (Ohio Com.Pl.1918) ("It has already been seen that a by-law may be created by custom or usage. For similar reasons a board of directors may by acting separately in an individual capacity establish a custom or usage that will be binding upon them and upon the corporation.") (internal quotation marks omitted); *Emory v. Jackson Chapel First Missionary Baptist Church*, 165 N.C.App. 489, 598 S.E.2d 667, 670 (2004). *See also Shovers v. Shovers (In re Estate of Shovers)*, 2009 WL 2591271 at *8 (Wis.Ct.App. Aug.25, 2009) (holding that "mutual waiver of the bylaws conditions by the conduct of the shareholders" occurred); *Keating v. K–C–K Corp.*, 383 S.W.2d 69, 71 (Tex.Civ.App. 1964); *Farmers' State Bank of Riverton v. Haun*, 30 Wyo. 322, 222 P. 45, 53 (1924) ("The evidence in the cases at bar is clear that the requirement ... was completely, or almost completely, ignored practically from the beginning, so that it is probable that even the stockholders of appellant had knowledge thereof and acquiesced therein. In any event, the directors were fully cognizant thereof and must be held to have acquiesced therein and to have waived the requirement above mentioned."); *Blair v. Metro. Sav. Bank*, 27 Wash. 192, 67 P. 609, 612 (1902). *See generally* 18A Am.Jur.2d Corporations § 275 (2009) ("It is accepted law that bylaws may be amended informally ... and may be evidenced by a course of proceeding or conduct on the part of the corporation inconsistent with the bylaws claimed to have been amended or repealed."); 8 Fletcher Cyc. Corp. § 4179 (2010) ("[I]t has been held that bylaws may be modified by usage, without any formal action taken for such purpose."). The Court, therefore, concludes that the Debtors' Bylaws were amended through custom and usage to provide for the election of the directors of the Tier Two Debtors and the Tier Three Debtors by vote of the Board of Directors of Holding.

The Tier Two Debtors and the Tier Three Debtors certainly were permitted to have more than one director, and Modi was elected as a director at those tiers. Even if Ghany was not removed at the second and third tiers, therefore, Modi's vote also was required to authorize the bankruptcy cases of the Tier Two Debtors and the Tier Three Debtors. *See Moni–Stat*, 84 B.R. at 757 (holding that there must be a majority vote of the board of directors to file a corporate bankruptcy); *Runaway II*, 159 B.R. at 538 (same). Because Modi did not participate in the authorization of the bankruptcy cases for the Tier Two Debtors and the Tier Three Debtors, their cases, like those of the Tier One Debtors, were unauthorized.

## IV. Conclusion

In accordance with the foregoing, it is hereby **ORDERED** that the Motion to Dismiss is **GRANTED**. These Chapter 11 cases are hereby dismissed. The Court will retain jurisdiction of and will address the request for sanctions by separate order.

**IT IS SO ORDERED.**

Exhibit A